UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

E-Z EATING 47 CORP., E-Z Eating 41 CORP.,
E-Z EATING 46th CORP., E-Z Eating 8th CORP.,  :  Civil Action No. 06cv5990 (JES)
E-Z EATING CORP., LUAN SADIK and
ELIZABETH SADIK,                              :  COMPLAINT

          Plaintiffs,

                                    **ECF CASE**

        v.

BURGER KING CORPORATION,

          Defendant.
_____

Plaintiffs, E-Z Eating 47 Corp., E-Z Eating 41 Corp., E-Z Eating 46th Corp., E-Z Eating 8th Corp., E-Z Eating Corp., Luan Sadik and Elizabeth Sadik, by their attorneys, Gilbride, Tusa, Last & Spellane LLC, and Weir & Partners LLP, as and for their Complaint ("Complaint") against Defendant, Burger King Corporation ('BKC"), allege as follows:

**Nature and Summary of Action**

1. This case arises out of BKC's manipulation of one of its franchisees, which manipulation caused the franchisee grave financial losses. Specifically, in response to the concerns of one of its most loyal and visual franchisees, the Plaintiffs, who own and operate Burger King® restaurants in Manhattan, BKC made false representations to the Plaintiffs, which the Plaintiffs reasonably relied upon to their detriment. The result of reliance upon those false representations has been disastrous for the Plaintiffs, while Plaintiffs' actions taken in reliance on those representations benefited BKC immensely during BKC's successful promotional campaign to become a publicly traded company.

**Parties and Jurisdiction**

2. Plaintiffs E-Z Eating 47 Corp., E-Z Eating 41 Corp., E-Z Eating 46th Corp., E-Z Eating 8th Corp., and E-Z Eating Corp. are business corporations organized and existing under the laws of the State of New York, which operate in New York County, New York (collectively, "E-Z Corp.").

3. Plaintiffs Luan Sadik and Elizabeth Sadik are adult individuals and citizens of the State of New York, who operate E-Z Corp. in New York County, New York. (Luan Sadik and Elizabeth Sadik are referred to, individually, as "Sadik," and, collectively, as the "Sadiks.")

4. Defendant BKC is a business corporation organized and existing under the laws of the State of Florida, with its principal place of business at 5505 Blue Lagoon Drive, Miami, Florida, 33126.

5. This Court has subject matter jurisdiction of this action under and pursuant to 28 U.S.C.A. §1332(a) and (c) in that Plaintiffs are citizens of the State of New York, and Defendant is a citizen of the State of Florida, and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

6. Venue is proper in this district under and pursuant to 28 U.S.C. §1391(a) in that Plaintiffs operate businesses in this district and many of the transactions giving rise to Plaintiffs' claims arose in this district, and Defendant transacts business in this district.

**Relevant Background**

7. E-Z Corp. is a franchisee of BKC and operates four Burger King® fast-food restaurants in New York City, New York.

8. The Sadiks are the owners of E-Z Corp. and assist in the operation of the restaurants. The Sadiks have personally guaranteed certain obligations as set forth in the respective franchise agreements between E-Z Corp. and BKC. The following chart sets forth E-Z Corp.'s BKC restaurants involved in this

matter (the "Restaurants"), as well as the specific BKC restaurant designation numbers, the address of the respective restaurants and the date of the respective franchise agreements:

| Burger King® Restaurant No. | Address | Date of Franchise Agreement |
|---|---|---|
| 10365 (DTL) | 115 East 23rd Street New York, NY 10010 | 12/04/1996 |
| 11100 (DTL) | 485 5th Avenue New York, NY 10017 | 10/15/1997 |
| 12287 (DTL) | 777 8th Avenue New York, NY 10036 | 03/10/1999 |
| 12288 (DTL) | 55 West 46th Street New York, NY 10036 | 08/04/1999 |
| 13447 (DTL) | 129 East 47th Street New York, NY 10017 | 02/02/2001 |

9.    Although Plaintiffs had successfully operated the Restaurants since 1996, by 2001 it was obvious to both the Plaintiffs and BKC that the BKC brand of restaurants was beginning to show failures in its product line.

10.    Upon information and belief, BKC's sagging results were due to, among other reasons, BKC's lack of regional and national marketing efforts and the dismal nature of BKC's marketing compared to those of competing restaurants.

11.    As an affirmative response to BKC's sagging results, BKC adopted and/or implemented a number of programs, which were supposed to reinvigorate the BKC brand, as well as give relief to certain franchisees that were having financial difficulties.

12.    Unbeknownst to Plaintiffs, BKC's programs, as referenced herein, upon information and belief, allowed BKC to gather information on its franchise community, which information was used to

categorize BKC franchisees into those that were valuable to BKC and those that were not as valuable to BKC.

13. Upon information and belief, between 2001 and the present, BKC used the aforementioned information to streamline its corporate and franchisee operations by consolidating those franchisees BKC deemed valuable and leaving other franchisees, which were deemed not as valuable to BKC, to fend for themselves.

14. In connection with its aforementioned streamlining process, BKC made several representations to Plaintiffs that it would assist them with the Restaurants. In particular, BKC represented that it had selected the Restaurants as among those that would receive BKC's operational and/or financial assistance such that the Restaurants would be able to compete effectively with competing restaurants, including but not limited to: (a) brand strengthening through increased advertising; (b) reasonable concessions regarding repair and maintenance requirements; and (c) flexibility to design menus to complete within relevant geographic market.

15. Plaintiffs reasonably understood and relied upon those representations. More specifically, Plaintiffs reasonably believed that BKC would help Plaintiffs increase their revenues or, in the alternative, BKC would allow Plaintiffs to close their restaurants without suffering economic harm and/or being subject to any financial obligation to BKC as a result of doing so.

16. In reliance on the aforementioned representations, Plaintiffs continued to operate the Restaurants as they had previously. By doing so, however, Plaintiffs forewent their opportunities to close or sell immediately one or more of the Restaurants.

## The Assistance Agreement

17. By 2005, Plaintiffs were suffering certain financial losses, as the Restaurants were not producing sufficient revenues to sustain the business, the result of which, among other things, was that Plaintiffs began to fall behind in certain royalty and advertising payments due to BKC as provided under the respective franchise agreements (the "Indebtedness").

18. Plaintiffs sought permission from BKC to close or sell their Restaurants without being subject to any "early closing" penalties that may exist under the franchise agreements, including relief from the Indebtedness.

19. Plaintiffs reasonably believed BKC would grant such permission since the Plaintiffs forewent their opportunity to close or sell immediately the Restaurants based on BKC's representations that it had selected the Restaurants as among the BKC franchisees that would receive operational/financial assistance.

20. Furthermore, Plaintiffs' request for permission was reasonably expected to be granted in any event because BKC had granted similar relief to other franchisees in Plaintiffs' geographic market.

21. Rather than granting to Plaintiffs its permission to close or sell without penalties, BKC extended to the Plaintiffs credit relative to the Indebtedness, wherein beginning on July 1, 2005, Plaintiffs would make an interest only payment on the Indebtedness for twelve months, at which time, Plaintiffs would then be responsible for a monthly principal and interest payment to BKC for a remainder of the credit term.

22. Simultaneously with this extension of credit, BKC promised that it would support the Restaurants operationally and financially.

23. Plaintiffs, while under severe financial pressure and in reasonable reliance on BKC's representations that BKC would help Plaintiffs with their financial difficulties relevant to the Restaurants, agreed to the terms of the credit and on May 1, 2005, executed a promissory note in the amount of $334,779.00, an Assistance Agreement, as well as other relevant documents (collectively the "Assistance Agreement").

## BKC's Failure to Assist and Other Misconduct

24. Prior to Plaintiffs' execution of the Assistance Agreement, BKC offered a national promotional program called the "Value Menu," wherein certain food products were provided to customers at substantially lowered prices compared to BKC's traditionally priced menu. The food prices provided under the Value Menu were also substantially lower than those of comparable food products provided by BKC's competitors.

25. The Value Menu was considered a double-edged sword by Plaintiffs, since it carried a potential to reduce profitability of a Burger King® restaurant as well as a potential to bring more revenues.

26. Under the Value Menu program, a Burger King® restaurant had to sell certain threshold amount of Burger King® food products in order to become profitable. If a Burger King® restaurant did not sell enough Burger King® food products under the Value Menu, it would suffer significant financial losses as it could not even pay for its cost of goods sold.

27. In the meantime, it was possible for a Burger King® restaurant to go out of business if it did not sell enough Value Menu food products to break even and generate profits. Upon information and belief, BKC acknowledged this inherent danger relating to the Value Menu as it published certain guidelines relating to the proper level of the adoption of the Value Menu by any given Burger King® restaurant.

28.     At around the time it extended the credit to Plaintiffs, BKC knew, based on the Restaurants' financial performance, that the Restaurants were not a suitable candidate for another Value Menu program – i.e., BKC knew Plaintiffs did not have enough financial resources to participate in another Value Menu program and wait until they broke-even and generated profits.

29.     Per BKC's own guidelines and its representations made to Plaintiffs regarding its financial assistance, Plaintiffs' Restaurants should have been excluded from participating in another Value Menu program.

30.     Nevertheless, on February 13, 2006, BKC required Plaintiffs to again adopt the *NY Value Menu*, another Value Menu program.

31.     Upon information and belief, BKC knew that its Value Menu program would result in a significant decrease of Plaintiffs' profits, which, in turn, would cause significant financial losses to Plaintiffs.

### BKC's Improper, Ulterior Motive

32.     On February 16, 2006, BKC filed with the U.S. Securities and Exchange Commission (the "SEC") for the right to engage in an initial public offering (the "IPO") for its stock, to be traded as a publicly traded company.

33.     Upon information and belief, beginning in or around 2005 and continuing to the present, BKC engaged in a self promotion campaign designed to strengthen its bid to obtain a high initial stock price during the IPO.

34.     To support a high initial stock price during the IPO, it was essential that BKC appear to potential investors that it was financially healthy and had a good relationship with its franchisees.

35. As the number of BKC franchisees who participated in the Value Menu grew, the appearance of BKC's financial health and its favorable relationship with the franchisees also grew.

36. BKC knew that if more BKC franchisees participated in the Value Menu program at or around the time of its IPO, BKC would have a bigger market share of the fast-food industry and that would generate more interest from potential investors in the IPO.

**Financial Losses Sustained by Plaintiffs**

37. Upon information and belief and in furtherance of its own self-interest, BKC disregarded the negative financial impact the *NY Value Menu* would have on Plaintiffs and their Restaurants. BKC knew that the *NY Value Menu* would cause significant financial losses to Plaintiffs, but was indifferent because the timing of Plaintiffs' adoption of the *NY Value Menu* was perfect for its IPO.

38. Although as part of BKC's self promotion campaign relevant to its IPO, Plaintiffs were promised financial help and a regionally strengthened brand which supported Plaintiffs, neither was delivered and as a result, Plaintiffs have now suffered severe financial damages.

39. While BKC's actions brought significant financial losses to Plaintiffs, BKC benefited from Plaintiffs' standing as franchisees, as well as from the Plaintiffs' Restaurants remaining open in an important market like Manhattan, New York during the IPO.

40. Upon information and belief, BKC's IPO was successful, generating hundreds of millions of dollars for BKC.

41. As a result of BKC's false representations and/or its failure or refusal to honor its promises to Plaintiffs, which inured to BKC's benefit, Plaintiffs have been substantially damaged.

## FIRST CLAIM FOR RELIEF
### (Common Law Fraud)

42. Plaintiffs incorporate herein by reference the allegations contained in all of the preceding paragraphs above as though set forth in their entirety.

43. By 2005, BKC knew that Plaintiffs were in financial distress and that Plaintiffs were in need of, among other things, financial and/or operational assistance.

44. In response to its discovery of Plaintiffs' financial distress, BKC represented to Plaintiffs that they were one of the selected franchisees who would receive financial/operational assistance from BKC.

45. As a part of its financial/operational assistance, BKC offered, among other things, certain credit under the terms set forth in the Assistance Agreement.

46. In return for BKC's self-serving assistance, Plaintiffs had to keep the Restaurants open for at least one year from the execution of the Assistance Agreement.

47. Plaintiffs reasonably relied on BKC's representations and promises, thereby executing the Assistance Agreement, and keeping their Restaurants open.

48. Upon information and belief, BKC induced Plaintiffs to execute the Assistance Agreements so that Plaintiffs would keep their Restaurants open during the time relevant to BKC's IPO.

49. Immediately after it required Plaintiffs to adopt the *NY Value Menu*, BKC filed with the SEC to engage in the IPO.

50. Upon information and belief, Plaintiffs' adoption of the *NY Value Menu* caused BKC to receive substantial money, while causing Plaintiffs significant financial losses.

51. But for BKC's false representations, Plaintiffs would have closed or sold their Restaurants immediately, which, in turn, would have had a negative impact on the IPO.

52. Upon information and belief, BKC's acts, representations, and omissions relevant to Plaintiffs' business situation were known by BKC to be false and were made to induce Plaintiffs to change their position in reasonable reliance upon BKC's representations as set forth at length herein.

53. As a result of BKC's misrepresentations and false promises, Plaintiffs have suffered and continue to suffer significant financial damages in an amount not yet determined, but believed to be not less than $1,000,000.

## SECOND CLAIM FOR RELIEF
(N.Y. GBL § 349, et seq.)

54. Plaintiffs incorporate herein by reference the allegations contained in all of the preceding paragraphs above as though set forth in their entirety.

55. BKC's actions against Plaintiffs constitute deceptive acts and/or practices in the conduct of business, trade and/or commerce in the State of New York in violation of N.Y.GBL §349, *et seq*.

56. As a result of BKC's deceptive acts and/or practices, Plaintiffs have suffered and continue to suffer significant financial damages.

57. Plaintiffs seek further relief in the form of money damages against BKC in an amount not less than $1,000,000, as well as cost of suit, attorneys' fees and treble damages, as permitted under New York law.

## THIRD CLAIM FOR RELIEF
(Promissory Estoppel)

58. Plaintiffs incorporate herein by reference the allegations contained in all of the preceding paragraphs above as though set forth in their entirety.

59.     As set forth above, BKC made numerous promises and gave assurances to Plaintiffs regarding BKC's assistance to Plaintiffs for the Restaurants.

60.     Plaintiffs reasonably relied on BKC's promises and assurances, and in fact entered into agreements with BKC, as well as changed their position including, among other things, not closing or selling the Restaurants as a result of such promises of assurances.

61.     In fact, however, BKC did not provide the assistance to Plaintiffs that Plaintiffs were promised, and, as a result, Plaintiffs suffered financial damages in an amount not yet determined, but believed to be not less than $1,000,000.

## JURY DEMAND

Plaintiffs hereby demand trial by jury of twelve (12) on all issues so triable.

WHEREFORE, Plaintiffs E-Z Corp. and the Sadiks demand judgment as follows:

(a)     on their first claim for relief, monetary damages, including direct and consequential damages, in an amount to be determined, but not less than $1,000,000, and preliminary and permanent injunctive relief, enjoining Defendant from exercising or enforcing any and all remedies it may have been entitled to under relevant agreements, but for its fraudulent actions;

(b)     on their second claim for relief, monetary damages, including direct and consequential damages, in an amount to be determined, but not less than $1,000,000, and preliminary and permanent injunctive relief, enjoining Defendant from exercising or enforcing any and all remedies it may have been entitled to under relevant agreements, but for its fraudulent actions; and

(c)     on their third claim for relief, monetary damages, including direct and consequential damages, in an amount to be determined, but not less than $1,000,000;

together with Plaintiffs' costs and disbursements of this action, including reasonable attorneys' fees, and such other, further, and/or different relief as this Court deems just and proper.

Dated: New York, New York
August 7, 2006

                         GILBRIDE, TUSA, LAST & SPELLANE LLC

              By: *s/*
                  Bennett H. Last (BL-7607)
                  Frederic P. Rickles (FR-0297)
              708 Third Avenue, 26th Floor
              New York, NY 10017
              Phone: (212) 692-9666
              Fax: (212) 661-6328
              bhl@gtlsny.com
              fpr@gtlsny.com

                      *-and-*

              WEIR & PARTNERS LLP
              Oliver D. Griffin (OG-9666)
              Edward T. Kang (EK-6738)
              Suite 500, The Widener Building
              One South Penn Square
              Philadelphia, PA 19107
              (215) 665-8181 (phone)
              (215) 665-8464 (fax)
              ogriffin@weirpartners.com
              ekang@weirpartners.com